May it please the court my name is George Donaldson I'm here as counsel on behalf of the appellants and before I start my argument I would like to reserve four minutes of my time for voice of okay I'm sorry about that four minutes of my time for rebuttal I'd like to begin argument by focusing on the issues relating to the partial professional services exclusion that was as a part of the DNO policy and is obviously one of the main issues in the case Brits argument which was essentially adopted by the district court on this issue I think can be fairly stated as follows if e-planning rendered any professional services to my clients which it admittedly did in connection with the sale of securities to them then any of the other acts alleged by us against e-planning that do not go to its professional services are nonetheless not covered by the DNO policy by virtue of application of the and that the district court primarily looked to in coming to this conclusion is a prepositional clause that appears in the exclusion namely the in connection with clause in other words if an act an error or omission is in connection with professional services rendered by or on behalf of e-planning the position taken by Brit and the district court is that those that that language sweeps up everything that e-planning is alleged to have done even though it is not one of its professional services the allegations in the complaint would you suggest are on the other side of art are not within the e-planning subsequent to the sale of securities to our clients certain of its representatives because they had an affiliation with the sponsor of that investment thereafter went in after my clients bought and engaged in activities that led to the demise at least in part of the investment and one particular one that I'm going to focus on which is probably the most egregious is my clients were told that a certain amount of money would be taken out in the way of a loan on the properties that were being purchased what happened after the closing is that an additional loan was put on those properties thereby allowing the AREI the sponsor and its affiliates including Mr. Armitage who wore both hats at e-planning and at AREI allowed them to take this money out which we thereafter believe they mishandled now it's one of the problems that whatever Mr. Armitage might have been might have done with that in that regard was not qua e-planning it was it was with his other hat on in other words how does e-planning become part let's assume that this is a separate thing but why is why do you get to sue e-planning and Armitage over it well for one thing Armitage owned over 20% of e-planning and absent discovery there's no way for me to tell you that some of that money did not find its way through his e-planning connection as opposed to his AREI connection that's the problem there are a lot of unanswered questions here that would have been answered with some discovery and which puts this case in an odd posture I believe for current argument which is on a motion to dismiss as opposed to after we've had a chance to look at exactly what happened but Armitage was a substantial owner of e-planning as I mentioned I believe it was over 20% and so when he engages in AREI and I say he's wearing both hats it's not clear where that money is ended up in whose pocket that money ends up in whether it's a AREI or whether it's e-planning's pocket anyway that wasn't the ground on which the district court held it held on to coverage they held it that I mean did he specifically hold that this particular action was within the exclusion yes yes because what the that conduct was in connection with the rendering of professional services namely the sale of securities now there's there's a bit of a factual problem that arose below and led to the judge the district court judge concluding that certain of the allegations were implausible namely that that e-planning never got the money in the first place and and also that these post-management activities didn't make any sense well with respect to the latter the post-management activities make perfect sense when you appreciate the allegation that these companies were affiliates of each other when you're in an affiliate relationship it's not uncommon for one company to be involved in the affairs of its affiliated company so I don't think it's implausible at all but here's where I believe the district court is wrong your honor on the question of whether or not these post-sale activities not embraced within professional services possessed in my view by e-planning is that there have been two recent cases one of which the court did in fact discuss food pro but there's a new case that I cited to the court in a supplemental letter North County's now North County is a very important case because what it does is it expands on food pro in such a way that it actually addresses the prepositional clauses that we really are at issue here on and that the court uses the basis for its conclusion that the exclusion applied to all acts professional and non-professional specifically the the facts in North County's were a situation where at a party did some architectural planning on it an accretion of a dam and thereafter did some construction work on the dam and the architectural work was clearly a professional service whereas much of the construction work was considered to be ordinary and not within the scope of that particular actors professional expertise lawsuits were thereafter brought and and the court eventually dismissed the whole case said well the professional services clause applies it arises out of the out of the professional services even this construction work that's not really a professional activity and ultimately the Court of Appeal reversed that and said look at you can't take clauses prepositional clauses like in connection with and arising out of and use them to expand an exclusion because to do so does expand the exclusion the only question is how far I mean it's different than if they said it has to be that it has to be in connection with that so it's not that you can't it doesn't mean anything it's just a question of how far does it go right but well when you read that with FUDPRO what it means is how far you go is you do not go beyond professional services in connection with a professional services exclusion fairly read North County stands for the proposition just as does FUDPRO that the injury has to be a product of your professional service the language here is actually is a little different because it isn't injuring connection with professional services it's an action in connection with professional services. So it's different language than in the other clauses, in the other cases. Well it may well be different your honor but I think it comes down to the same thing I mean are we going to take a professional services clause and allow it to be used to exclude from coverage activities that are not professional services. Well but because of the way this one is written the answer has to be yes to that because it has actions in connection with professional services it doesn't say professional services in connection with professional services. Well that's really no different than the language that was that was used in in FUDPRO and and in North Counties I mean both of those were acts arise I think they used arising out of but the court here held. That didn't use injury arising out of. I'm sorry your honor. They didn't use injury arising out of. I didn't hear the first. They didn't use injury arising out of rather than acts arising out of. You know I I believe well I believe the language was well it could it could have been that I don't know to be quite honest with you but I don't I guess I don't see the difference in this sense. Well the only difference is that it necessarily must include things that are professional services otherwise when you say an action in connection with professional services otherwise you're just saying professional services in connection with professional services. Well I mean if it's in you could say you could certainly use different language than in connection with but I think what these cases say is that all of these are here to pick up things that are that are not professional services and it just seems to me that what's left of the insurance if it not only includes your professional services but anything else that that you did in you know in regards there too. So can I just ask you one question about. So these acts post sale acts. Yes. That you're talking about with Judge Razon. Were they alleged in the underlying arbitration claim? Yes in a in a general way. In what way? I mean I looked at it and the claim before the arbitration proceeding was you know really focused on the on the purchase the sale and purchase of the instrument. It certainly did it certainly had as it as one of its focuses the misrepresentations. I grant you that. However. Well that would seem to be the main focus given the venue in which you were proceeding. Well but if you look at the answer in the arbitration it's clear that Britt believed that that particular claim was focused on operational matters not just misrepresentation. In fact they use that. But the point is is that the loan that I mentioned for example was certainly something that was included in the statement of claims and the loan occurred after the transaction closed. So at least insofar as the loans concerned I don't think it'd be fairly said that it was focused in any way solely on misrepresentations. So your theory is is that that securing the loan or taking out the loan just didn't have anything to do with the rendering of the advice. I don't know. The recommendation to purchase these instruments. Absolutely not. And I'll tell you why. The private placement memo says it's a 20 roughly a $25 million investment. We're going to be taking out on a $17 million loan from General Electric. They also say we might need some bridge financing but it'll be paid back right away. What do they do? They close the deal. They take out four they add a $4 million second thereby sucking four more million dollars out of the project. Well it could be part of the misrepresentation i.e. it could be that they knew all along that they were going to do that and therefore when they said they weren't going to do it they misrepresented. Yes. That's certainly possible but again the only way we're going to know that is if we did some discovery because this is not something that. Suppose that was the case. I'm sorry. Suppose that turned out to be the case. Is it then covered or not covered? Is there any exclusion or out of the exclusion? If they misrepresented. Right. The loan. In other words if the decision to take that loan out had been made before the sale and that and these were closely enough connected companies that they knew that and so they misrepresented what they'd done. Could you have both a cause of action for the misrepresentation and a second one for doing the loan. I mean what is the cause of action for doing the loan if it isn't a misrepresentation? Well breach of fiduciary duty would be one. It could. I think you're really then moving into the area of concurrent causation which you can have where you have in a third party case where you have two causes coming together yielding an injury. So I would say in answer to your question there would be a cause of action clearly for the misrepresentation but I think there'd be a cause of action for the taking out of the loan. So that's the answer. Do you happen to know, I mean I will ask the next cases, but is this loan allegation involved in any of the other two cases? Does the which? This loan allegation. No, no and it's an important point that you raise that I would like to just in a second. One thing that you have to understand about this case is that it involves different securities issued at different times and it's a very far flung operation. My clients just invested in one real estate investment which was this Newhall project involving 1031 exchanges. You're going to hear from the others that there's all kinds of other investments. There's corporate notes. We didn't buy corporate notes notwithstanding what the district court said in its opinion. Corporate notes, there were other real estate projects. Koenig and his group syndicated a number of different projects at different times during the course of this period. And so the reason it's important is on this issue of a Ponzi scheme which comes up. What about the co-mingling claim? You tried at some points to say that that one was not connected. Correct. And what is your argument there? It seems more closely connected at least. Well, my argument there is this. The way this transaction was supposed to go down, it was a 1031 exchange. Because it's a 1031 exchange, the monies do not go to the broker-dealer. They can't go to the broker-dealer. If they do, it destroys the tax implications. It has to go to a qualified intermediary which there's no evidence that e-planning was one. So the monies are transferred directly to the AREI affiliate Newhall Capital Resources which then bought the properties. According to Britt in the FINRA answer, their view was as soon as we sold the securities, we were done. We were out of there. We had nothing more to do with it. We don't believe that's true in light of Guidi and Armitage's subsequent involvement. The co-mingling as it related to my case, to the extent there was co-mingling, I believe it occurred as a result of the $4 million loan because those proceeds were never accounted for. And it is clear that this was, at the end of the day, or became, a Ponzi scheme. Now, when it started, again, without discovery, we don't know. But the co-mingling would be separate and distinct from the original sale of securities. But that's morphing into more of a temporal distinction rather than a qualitative distinction. Yeah, I think it is temporal, but — Because, I mean, if you have money, if you pay money for a loan, for a security, and you do something with that money that you shouldn't do with the money because you have an obligation to the people who gave you the money, then why isn't that in connection with the professional services of selling the securities? I would say if it were the way you just framed it, it may well be. But that's not how it happened. Because the money didn't go to them, but so what? It didn't go to them. But so what? Well, because — It's because — so what you're saying is it's because of where it went when they were co-mingling it, they were co-mingling it with their AI hat on rather than with their e-planning hat on. Is that essentially what you're saying? Well, yes, I think that is what I'm saying, is the co-mingling occurred subsequent It wasn't a situation where you gave a broker-dealer $10,000 and said, here, invest it and reinvest it, and he does, and he loses the money. That's not what happened here. E-planning sold these things. The money went to AREI. They then bought a piece of property, and then monies were taken out of that piece of property by virtue of this new, undisclosed loan. We believe e-planning was involved in that. We don't believe it was part of its professional services. Therefore, why should it be embraced by professional services exclusion? Okay, thank you. We let you go away over your time to answer those questions. Thank you very much. I appreciate it. Yes. Good morning, Your Honors. May it please the Court. My name is Michael Fox, and I represent the Respondent for UW-Limited. Focusing on some of the questions you raised, Your Honor, and specifically, you heard Mr. Donaldson say that he was and his clients were deprived of the opportunity to do discovery as to what Armitage was doing and what Armitage's activities may have been in connection with the post-sale activities. Those are all discovery and facts which could have and should have been developed in the underlying claim. They're not really at issue in the coverage litigation, which we're talking about here today. What this Court is being asked to do is the same thing that the district court was asked to do and, frankly, the same thing that Britt was asked to do, which was when the insurer's ---- Well, this claim arose through the arbitration proceeding, right? The underlying claim is the arbitration. Arbitration proceeding, right? Right. And so that's where we look to what's the nature of the claim. That's the term I was about to make, which is this Court does what Britt essentially did when it received the claim, which is look at the statement of claim and look to determine whether there's a duty to defend or cover general policies. Whether there's a potential claim. Potential, no, potential for coverage under the policy. Potential for coverage under the policy. There's no dispute that a claim was made. We know that. That's what the statement of claim is. It's a FINRA claim or a FINRA arbitration, and it alleges number of acts and omissions in connection with professional services, which is e-planning. And Mr. Guidi allegedly performed in connection with their professional services for the plaintiffs. And again, that's the claimant, plaintiffs or claimants in the underlying litigation which we're talking about. And specifically, the claim alleged that e-planning sold the securities. So just stepping back for a second, this notion of the e-planning played no role in collection of the monies, which were later commingled and diverted into the Ponzi scheme like the plaintiffs are trying to divert the Court's attention is not true. The specific claim was that e-planning was involved in the sale. He didn't say they weren't involved in the sale. He said, as I understood it, he said that they were involved in the sale, but that because of the structure of the sale, the money didn't go into their coffers. Right. But again, the issue is relating whether the money went into their coffers or not. And that was an issue which he said he needed to do discovery as to the underlying claim. Well, but what happened here was the claim was never litigated, right? It was a claim. The FINRA claim was litigated. In fact, he talked about the fact that the e-planning defendants filed an answer in the FINRA arbitration. Ultimately, it was resolved and settled. Well, that's what I mean. There was no trial transcript. There was no transcript of what actually happened. In the FINRA arbitration, that's correct. Right. But what there is is a record of what the claim was. Right. And the nature of the claim by which we look at whether it's covered under the terms of the policy. But with regard to what, as I recall, insurance law, I mean, anything that might come under that claim essentially. Anything that might develop under it. Something that might develop under that claim, but it's also based on what the claim is and the claim that's presented and what you can tell based on. But the claim is that e-planning sold it, but that doesn't tell you where the money went. Well, but I read through this statement of claim, and it doesn't say that e-planning plays a role in the pilfering of the money or taking of the money. In fact, if you listen to Mr. Donaldson, he said that it was a disconnected activity, in fact. And he said it was done while wearing the hats of A-R-E-I. That's an important concession that they're making because, in fact, it's a different concession. And that's why I was asking him this. I mean, it could be that it will turn out that it seems to me the two things we're focusing on in this case, unlike the others, is the commingling and mostly, at least for me, this loan business. Right? It may well be, it sounds to me like it may well turn out that e-planning didn't do it at all. It was A-E-I that did it. But that's not the ground on which they were excluded. No, they were excluded because those acts, well, two things. They were excluded because the statement of claim, which, again, I've read through and have a hard time finding those allegations where it talks about e-planning being involved in the commingling and where it talks about e-planning being involved in the subordination of additional notes. It's not, as Your Honor pointed out, it's difficult to find those allegations. But still, it's not. There is reference to the loan. There's reference to the loan. Yes, there is. And it's not the ground on which the district court found that the exclusion applies. We're dealing with the exclusion. We're not dealing with other reasons why there might not have been coverage.  Correct. But my point is what the district court did is it accepted the plaintiff's allegation is true, that there was this commingling by e-planning and there was this additional debt placed on the property by e-planning. And you said it was not within the — it was within the exclusion. Within the exclusion because of the specific nature of the — because of the specific language of the exclusion, which is the— But not because they didn't do it. It was somebody else who did it. Correct. So therefore, let's forget that part and let's try and figure out whether it's in the exclusion, assuming that they're sufficiently connected with it for other purposes. Well, and again, as you pointed out, Your Honor, the cases on which they're relying upon focus on different exclusionary clauses, different language in the exclusionary clauses. Well, that's fine. But we still have to know where does this in connection with stop? And does it stop at the point that the — the allegations don't have to do with the management of a — of an asset? But — and as Mr. Donaldson pointed out, it had to do with their breach of fiduciary duty to the plaintiffs in connection with their management of that asset. And their fiduciary duty rises from or is in connection with their trusted advisor status as the investment professional that placed them in those properties, as the investment professional that made the representations about the nature of those investments throughout. And that's what the district court noted. You can't take the money from the plaintiffs in trust, then go and handle it improperly or allegedly improperly and say that that's not connected to or not done in connection with the professional service with which you rendered to those clients. That's the specific language with which the court focused on. That's the specific language of the exclusion here. And frankly, it's a specific language of the jurisdiction of the forum by which they sought to litigate their claims, which is FINRA. Those claims that they're talking about, the commingling of assets, I mean, the commingling of funds, the commingling of the additional notes on the property, they aren't alleged in the civil litigation. They're alleged in the FINRA claim. And FINRA is a jurisdiction where you bring claims in connection with the professional services against e-planning. That was the claim. Well, that could just be one. I mean, that's just what was before FINRA. But there's no other claim, Your Honor, and that's the point. Well, but FINRA has a, you know, FINRA. How broad is FINRA's authority and what can they do? They're dealing there with the sale of securities, right? Well, FINRA is dealing with the sale of securities and acts in connection with. That is the jurisdiction by which FINRA had. That's the jurisdiction by which plaintiffs assumed FINRA had because they brought their claims against e-planning and GUI. Did FINRA say there was a breach of fiduciary duty in award grant relief? Well, no. There was a settlement of that claim. Could they have arbitrated that breach of fiduciary duty claim? I suppose it's possible they could have arbitrated the fiduciary. Well, I mean, you said that. Let me ask you. I still ‑‑ so your point is that anything that happened after the sale, after they purchased the securities or the instruments, no matter what it was, is all related to the original recommendation or advice or professional advice to buy these instruments. Is that right? The claims that are alleged in the underlying claim, that's correct, Your Honor. We aren't talking about a situation like Food Pro where there was a separate act of negligence unconnected to the services by which Food Pro was hired to perform on the property. It was an ordinary negligence claim, in fact, outside the scope of the professional services. And the clause there, so that's just my point. We're not talking about any acts. We're not sweeping so broadly as to eliminate coverage under the policy altogether. What we're looking at is the statement of claim, which was presented to Britt, by which Britt was obligated to evaluate whether there was a potential for coverage. Britt evaluated the alleged claims in the underlying statement of claim, determined there was no coverage under the exclusion. So the point is, it's not any acts or whatever acts we can conceive of that Guidi or E-Planning may have performed after they sold the securities. It's the acts alleged in the claim, because it's those acts which were presented for coverage and, frankly, why we're all here. And so the ---- What do we know in the record about the limits of FINRA's jurisdiction? We only know, and again, we pointed this out, Your Honor, which was the nature of FINRA's jurisdiction. It has a specific language which says claims in connection with the professional advisory services. FINRA may have indeed dismissed any claims, could have, might have dismissed those claims, but they weren't rebrought and they weren't refiled in any other jurisdiction. So, again, my point is we're stuck with the nature of the claim the plaintiffs presented. The plaintiffs' own admission, if you will, in presenting a claim to that jurisdiction is that those breach of fiduciary-like claims related to the commingling or related to the note were necessarily in connection with the professional service. So regardless of whether the FINRA court might have accepted jurisdiction, that's an admission or a statement that the plaintiffs made in pursuing the claims against e-planning and GWEDI in FINRA. And the language in the FINRA jurisdictional rule is identical, frankly, to the in-connection-with language of the exclusion at issue here. Would you address Mr. Donaldson's argument that the recent decisions in food pro and north counties have changed the analysis with respect to these prepositional clauses? Yes, Your Honor. And, frankly, I addressed it in part a moment ago with food pro. It's a different case and different facts, first of all. It's also a different exclusion, as Judge Berzon pointed out. In that case, it wasn't whether the injury arose out of the professional services. And that was the specific language of the exclusion at issue in food pro. Here, the injury or the exclusion applies to acts, errors, and omissions in connection with the professional services that the companies performed. What's the difference? We have an act or error that caused the injury, don't we? There is an act or error that caused the injury. But the court was looking specifically to the nature of the injury that occurred and looking to see how that might have been connected with the professional services. You're right, Your Honor, that there has to be some act, error, or omission which causes the injury. But my point is that one... But an injury arising out of professional services seems to be one caused by the professional services, which is a different language. It's slightly different. But, again, we're not focusing, as plaintiffs want us to do, is just looking for professional services and only excluding coverage for professional services, as the district court noted and as this court has noted in the past. Language like this, in exclusions specifically like this, in D&O policy, sweeps more broadly. And FoodPro is thus distinguished on that point alone. Frankly, North Counties also has a completely different language. The language there isn't in connection with or arising out of the professional service. It's much more specific. It's due to the professional service. So in that situation, if we had clauses or exclusionary clauses that are more similar... Kagan. Just to sort of, maybe this is not an answerable question, but in general terms, where does the in-connection stop? I mean, if you have a company that is selling, is providing the professional service of selling and advising on financial investments, what's the line? Is there a line that you can articulate that says what is something they would do that would not be in connection with professional services? Well, sure. You could put the facts in. This is what the court, the trial court, the district court made a point of noting. You could take the facts from FoodPro and look to see whether those were alleged in this statement of claim. And if they were, maybe you would have a different outcome. But you didn't have a situation where Guidi or e-planning was going to the plaintiff's house when they were selling them the securities and failed to prevent them from getting injured there. That would have been perhaps an act in connection with or while they're performing their professional advisory services, but it's not in connection with those services. It's just the mere presence on the property. And that was a fact which the cases since FoodPro have distinguished, which is that just being on the property doesn't do it. And so that might be one act, Your Honor. But again, we're focusing on the acts which are alleged in the statement. But in that analysis, if the e-planner professionals went to someone's house to sell them securities and backed up over the family dog and killed it, that's in connection with professional services, because they were driving to and from the house to render the professional services. It might be. But again, Your Honor, we're not dealing with that fact pattern. How do you interpret this clause as partial professional services exclusion, not a complete, a partial one? How can we interpret it in a way that doesn't swallow the coverage? I think we do it exactly how the district court did it, which was acknowledge the last half of the exclusion, which is frankly the corporate act buyback. It's when the professional services are actually being performed for the corporation. So the granting of options to the... Perhaps. Shareholder, an action by one of the shareholders for improper advice that one of the officers or directors may have given in connection with that individual shareholder of e-plannings purchase of securities, that's the carveback and why it's partial. It's given different names in different cases, but it's not uncommon for there to be that type of a carveback towards the end of many professional services exclusions. Okay. Thank you. Thank you, Your Honors. You get a minute. What about the notion that the FINRA jurisdiction is essentially limited to these kinds of claims? So if you brought a FINRA claim, you're essentially acknowledging that it was in connection with? No, I don't think that's right. I mean, the FINRA claim, it was brought as a FINRA claim originally because there were allegations of misrepresentations in connection with the sale of securities and we had signed agreements, which I believe bound us to FINRA arbitrations, which are common for securities claims. But it has nothing really to do with the in connection with language. Now... Why not? I mean, if it didn't... First of all, I gather it's correct that the jurisdictional description of FINRA is essentially the same, i.e., in connection with professional services. Is that right? That I honestly don't know, Your Honor. And moreover, if you were bringing it, I mean, your allegation had to be that this was about the sale of securities because that's why you were before FINRA, right? Well, before FINRA, I said earlier because we had bought securities from e-planning. All right. But if, for example, they had backed over the family cat, you would not have brought it before FINRA. That's correct. We would not. You brought this before FINRA, alleging that this was within the jurisdiction of FINRA, presumably because it was in connection with the sale of securities. Well, let me say this. We brought a FINRA action. We also brought a State court action. If it had turned out in the FINRA action that some portion of our claims could not be heard jurisdictionally by FINRA, we would have filed a different action. What are you looking for now? You're looking for the defense costs in the FINRA action? Or the amount awarded, settled in the FINRA action? No. We're looking for the amount of the stipulated judgment. Stipulated judgment, right. But it was in the FINRA action. Does that matter? No. I don't think it matters because FINRA action judgment can be enforced in court. So and there was a judgment rendered in the court. And that's where it was. What happened in FINRA, just so you understand, is that the FINRA we were barred from continuing in FINRA because e-planning filed for bankruptcy. Right. So the FINRA action essentially was mooted. And this was at the same time. But there was a separate State court action with the same allegations or different allegations? Basically the same allegations. I mean, they're slightly different, obviously, because there's certain things you have to say in court that you don't necessarily say in FINRA. Was that State court action tendered to Britt? I'm sorry, Your Honor? Was that State court action tendered to Britt for a defense? The State court action? Yes. In fact, it was. But that's not part of this. No, it's not part of this. But there was definitely a request for. What happened is there was the earlier E&O policy got exhausted. And when the D&O policy came along, Britt said we're not paying under this. And the same defendants, you know, filed, tendered it and argued it and lost. And then subsequently they entered into their stipulated judgments with us. Okay. So one thing I wanted to answer. I don't know. I have one minute. One point. Okay. One point. We've got two of these cases. We're going to be. I'm sorry. The point that I wanted to say is this. With respect to the issue that I think all the judges raised here, all Your Honors raised, is where does in connection with end? And the problem is, is that the way the district court interpreted it, there is no way of knowing when it ends. But food pro, I believe, especially as buttressed by north counties, tells us where it ends. And this is where it ends. The injury has to arise from a professional service. And if it doesn't arise from a professional service, it's not covered by the exclusion. Otherwise, there is no limit on where that in connection clause can take us. Thank you. Thank you.
judges: Morris, Paez, Berzon